### EDWIN MOODY *v.* WILLIAM C. HARPER.

1. EXECUTOR AND ADMINISTRATOR: SALE OF LAND TO PAY DEBT BARRED BY STATUTE.—An administrator has no right to sell the land of his intestate, to pay a debt barred by the Statute of Limitations.

2. PROBATE COURT: SALE OF LAND TO PAY DEBTS: PARTIES: EQUITY, POWER OF, TO ENJOIN SALE ORDERED BY PROBATE COURT: CASE IN JUDGMENT.—A party in possession of land, and claiming it by a purchase at a sheriff's sale, made under a judgment rendered against a decedent, is not a proper party

defendant to a proceeding in the Probate Court to sell the land for the payment of debts; and hence, has no opportunity to contest it in that court; but, if a sale of the land is ordered by the Probate Court to pay a debt barred by the Statute of Limitations, he may enjoin it in equity.

3. STATUTE OF LIMITATIONS: DOWER BARRED BY.—A widow's right to dower is subject to the bar of the Statute of Limitations; and her remedy for its recovery against a purchaser, under the husband, will be barred by his possession, after the removal of her disability of coverture, for the period prescribed for bringing an action of ejectment. See 1 S. & M. Ch. R. 494; 1 Harrison (N. J.), R. 107; 10 Ohio R. 24.

4. SAME: SAME: EQUITY: INJUNCTION AGAINST PROCEEDINGS TO ALLOT DOWER, BARRED BY LIMITATION.—A court of equity will, at the instance of a purchaser under the husband, enjoin the widow from proceeding in the Court of Probate to procure an allotment of dower, where her right is barred by the Statute of Limitations.

5. FORTHCOMING BOND: JUDGMENT ON: GOOD AGAINST SURVIVORS WHERE ONE OBLIGOR IS DEAD AT ITS FORFEITURE.—A judgment on a forfeited forthcoming bond is rendered by mere operation of law, without the intervention of the court or the parties, and without entry on the minutes of the court: and for this reason, such judgment only will be considered as rendered on its forfeiture as might be legally rendered; and hence, if one of the obligors die before the forfeiture of the bond, the judgment thereupon rendered by operation of law will be against the survivors only, and will be valid as to them.

6. RES ADJUDICATA.—A party will not be permitted to relitigate a matter once adjudicated, by merely presenting new arguments on a state of facts not materially different, in support of the right formerly determined against him.

7. SAME: SALE OF DECEDENT'S LAND WITHOUT RESERVE: PARTIES AND ATTORNEYS EQUALLY BARRED BY IRREGULARITIES IN EXECUTIONS: CASE IN JUDGMENT.— The rule charging parties with the consequences of irregularities in executions, is as stringent against attorneys who issue and control them, and purchase at sales made under them, as it is against plaintiffs who become purchasers; and hence, where the record in a suit, which unsuccessfully attacked the validity of a sale of land, upon the ground that the defendant died before the teste of the execution, and that the judgment had not been revived, disclosed the fact that the purchaser controlled and managed the execution as the agent of the plaintiff, it will be no ground for relitigating the matter in a new bill, that since the determination of the first, it has been discovered that the attorney purchased for the plaintiffs in the execution.

8. SAME: WHAT PARTIES CONCLUDED BY FORMER SUIT.—Where a substantial right is claimed in behalf of a party suing in chancery conjointly with another, such party cannot be considered as a merely nominal complainant; and he will be concluded by the adjudication in that case.

9. SAME: EJECTMENT: ACTION FOR MESNE PROFITS, BAR TO DEFENDANT'S CLAIM FOR IMPROVEMENTS.—If the defendant in an action of ejectment, or in an action for *mesne* profits, fail, without sufficient excuse, to set up his claim

Moody *v.* Harper.

in that action for valuable improvements made by him on the premises, he cannot afterwards come into equity for relief on that account.

10. SAME: PARTY CANNOT RELITIGATE IN EQUITY THE GROUNDS OF A MOTION FOR NEW TRIAL AT LAW.—A party cannot get relief in equity against a judgment at law, upon the ground that it was obtained by the fraud of his antagonist. If he made a motion for a new trial on that ground, and it was adjudged insufficient or unsupported by the evidence, in such a case the judgment of the court on the motion for a new trial is conclusive.

11. CHANCERY: JURISDICTION: RIGHT TO COMPENSATION FOR IMPROVEMENTS MADE ON LAND OF ANOTHER.—Whether a court of equity would give relief upon a bill filed for that purpose, to a party who entered *bona fide* and under color of title upon the land of another, and made valuable improvements thereon, *Quære?*

12. SAME: SAME: COMPLAINANT MUST DO EQUITY: RULE ON THAT SUBJECT: CASE IN JUDGMENT.—The principle that he who seeks equity must do equity, does not apply to a matter set up as equity against the complainant, which is not a defence to the relief sought by his bill, but is an independent claim for relief on the part of the defendant; and hence, where a complainant has recovered possession of land, and also *mesne* profits, in an action at law, and afterwards comes into equity to remove clouds upon his title caused by the wrongful acts of the defendant subsequent to the recovery, his bill will not be dismissed because he will not allow the defendant compensation for valuable improvements made on the land.

13. CHAMPERTY: WHAT CONSTITUTES.—To bring an agreement within the rule against champerty, it must appear, 1st. That the agreement was made before the suit was commenced, and that it was the moving cause of it; and 2d. That it was agreed by the party undertaking it that it shall be carried on at his expense; and hence, an agreement between an attorney at law and the owner of a judgment, that the attorney shall have one-half he may collect, is not champertous.

ERROR to the Chancery Court of Hinds county. Hon. John Watts, chancellor.

Moody alone sued out this writ of error.

*W. P. Harris*, for plaintiff in error.

There is an allegation in the answer of Harper to the cross-bill of Moody et al., that Moody obtained no title by his purchase under the judgments against Shields et al., because the sale under these judgments was void. The court will understand the nature of Moody's title and its defects by reference to the cases reported. 25 Miss. 484; 28 Ib. 645; 35 Ib. 63.

These cases make it apparent that Moody lost the land on the ground that he purchased under executions issued on original judgments, after the quashal of forthcoming bonds taken on previous executions, which quashals being made after the return term of the executions, were afterwards, by the decision of this court, held to be null and void.   The inferior courts had decided in favor of the validity of these quashals, and it is matter of common judicial history that thousands of innocent men were involved in great losses and embarrassments by a decision which to this day is questioned by some of the ablest lawyers of our State.   Certain it is that Moody was misled with many others, and bought in good faith, and paid his money.  Being in possession under a purchase fairly made, it was Moody's right to obtain any outstanding title with which to protect his possession when assailed, it matters not from what source.   This court has distinctly proclaimed that it is the unquestionable right of a party in possession in good faith, under a defective title, to buy in any claim for his protection.   The practice is neither censured by the courts, nor condemned by any code of sound morality, provided the party deals fairly with those from whom he purchases.

Charges of fraud are liberally sprinkled through the pleadings on both sides in this case.   The facts, however, must determine the character of the several transactions.

Let us look at the acts of both parties, and contrast the one with the other by the light which they afford.

Harper entered into a contract with Rain to prosecute his judgment for one-half of what might be realized, and thus became jointly interested with the creditor in the proceeds.   He found Moody in possession under a defective title of lands once owned by Shields. He examined the records, and finding that Rain had an advantage on the score of priority of lien, he caused an execution to issue and to be levied on the land.   That Harper was ignorant that Shields was dead, is not to be credited for a moment.   He knew administration had been granted.   His principal had constructive notice by the publication of notice to creditors.   He was bound to take notice of what the record contained, and that showed that no revival had taken place.     *W. W. Cook* v. *Toombs*, Opinion Book H. 545.

He bought the land at the sale for the benefit of himself and Rain

at a nominal price, and had the amount of his bid credited on the judgment. He, as a bidder, did not risk anything, and paid nothing. He paid the costs, but not as part of the bid. He paid them "independently," doubtless to induce the officers to go through the forms of a sale.

If the heirs had been brought in by *scire facias*, they could at least have prevented the sacrifice of their inheritance for $40. Although it is suggested in *Harper* v. *Hill*, 35 Miss. 63, that where the debt exists unsatisfied, notice to the heir could not be of any benefit, yet it is clear that the terre tenant and heir would have had the opportunity to prevent a sacrifice, or to have paid off the incumbrance to prevent a sale; to present all the objections to the execution which arose out of the previous liens. It is enough, however, to say, that in the case of *Cook* v. *Toombs*, the want of notice is sufficient in the case presented to render the sale void. The circumstances divest Harper's title of all merit, and strip him of the character of innocent purchaser without notice. I doubt when the creditor himself purchases, as was the case here, if he can ever be regarded as an innocent purchaser.

Some comments on the position of Harper and Moody seem to be justified, in order to present them for contrast.

The land had been sold in the lifetime of Shields, and the purchaser had been in quiet possession for four years. Harper, having become by his contract with Hugh Rain, a party in interest in the judgment, has an execution issued and levied. The levy is made in such cases in the sheriff's office, and not by seizure of the property. The sale would attract but little notice. If we suppose Moody knew it, we at the same time know that it was a void proceeding. The attorney attends the sale, and it is pretty evident he is the only bidder. To induce the officers to go on with the farce, he pays their costs "independently." Speculators of his own stamp would not encounter a bidder who had control of the judgment, and could, without risking a dollar, force competitors to bid high. He bid without intending to pay, and without paying one cent on the bid, and without risking a dime. It is a grotesque caricature of a sale. A judgment against a dead man whose estate had already wound up insolvent, is employed as a means to get a title to property made valuable by the honest industry of an igno-

rant purchaser, and the author of this caricature of a sale, who never paid nor risked as a bidder the amount of one cent, has been successful in court, as an innocent purchaser for value, without notice of the defect in the execution and sale.

We often try fictions in this court, but never a fiction so unreal as the case decided by this court in *Harper* v. *Hill*, 35 Miss. 63. The court acts upon what the record discloses, and would do wrong to listen to suggestions as to what existed outside of it. We do not assail the decision.

If Harper, by means of hook or crook, has obtained a judgment at law, and has effectually repelled the proceeding in equity, let him rest content with his legal advantage, but when he comes before the court for relief touching his unjust acquisitions, and again asserts that he is a purchaser of title, and asks that the man whom he has stripped of his possessions, shall be drawn up, in order that his teeth may be drawn or his claws pulled out, in order that he may not be able to vex him, the court may fairly examine the foundation on which he stands, in order to judge whether he possesses that merit which claims the protection of the court of conscience.

It is now apparent that Harper has availed himself of a void sale; that he has passed through the courts under false colors. The secret of his connection with the judgment is for the first time made known.

Moody could not have obtained knowledge of the contract between Hugh Rain and Harper. The judgment stood in the name of John Rain, and the statement that John Rain had not given authority is literally true, for his assignment is of a date subsequent to the sale.

It is also apparent that the redress which has been afforded him in the courts has far transcended any just measure of retribution or compensation. So long as he holds the improvements put on the land—estimated at $3000—so long as his hands grasp the $3000 for rents of houses and gardens which Moody erected and prepared, they are not the clean hands which the Court of Chancery will take in "friendly grasp." The hand which holds an unconscientious legal advantage is not a clean hand.

The answer which will be doubtless made to this presentation of the case is, that it is too late now to question Harper's title; that it has been adjudicated both at law and in equity between the same

parties. This brings us to consider the effect of the decisions. The judgment at law is conclusive upon Moody as to Harper's right of entry and possession; but a judgment in ejectment is not conclusive as to title, certainly not as to any party but the defendant. As to him, it is evidence conclusive as a particular action for mesne profits, but generally it is evidence between them of a right of entry only. The decisions of this court in that action between these parties have settled that the judgment of Rain had a prior lien, and that the execution on the judgment under which Moody purchased was void. No decision, however, has established that Harper's title is paramount; on the contrary, the case of *Harper* v. *Hill,* 35 Miss. 63, expressly asserts that the judgment in ejectment was not conclusive upon the heir of Shields, and that the heir could assert her claim in another proceeding, but had no right to interfere with the execution of the judgment against Moody. True, this court proceeded to give judgment on the aspect of the case there presented, assuming that Harper was an innocent stranger purchasing without notice under a voidable execution; but Harper had never disclosed the fact at that time, and it could not have been known that the judgment creditor was himself the real purchaser, and did not pay one cent on purchase, and could not be prejudiced by setting aside the sale.

The bill filed by the heir, whose title Moody now holds, having purchased it since the judgment in ejectment, did not aver that the judgment creditor made the purchase, and was affected with notice, and did not pay anything. These facts were not known, and Harper had taken a deed to himself, and thus put a false face on the transaction, which misled the heir and this court. For this defect in the bill it was dismissed on demurrer; but this dismissal is not conclusive against the heir or the assignee of the heir. A party is not barred of his right by such a dismissal on demurrer.

A decree to be conclusive between the parties must be made on the merits and an issue which involves them. The demurrer in chancery is nothing more than an objection made to the prayer for an answer. The decree on it is, that the defendant answer.

In *Gest* v. *Davis et al.* 2 Hill Ch. Rep. 335, Chancellor Harper says, at p. 341: "If a party by his bill makes out an imperfect case, so that a demurrer would hold, and the bill be dismissed on

that ground, I am not aware that this has ever been held a bar, if by a new bill he can make out a good case." This case examines the question fully.

As before intimated, if Harper had seen fit to stand on his recovery in ejectment, which was conclusive as to his right of possession as against Moody, and if having repelled the proceeding in equity he had been content to await another attack, he might use the judgment against Moody, and the decree, if that can be regarded as conclusive, which is not admitted; but he commences a proceeding in equity, in which he prefaces his statement by asserting title in himself, and asks relief upon the sole ground that he is owner clearly as to Mrs. Shields on her claim for dower, and as to Work, the administrator, and Moody as a creditor of the estate, he must have title.

In the course of this proceeding by Harper to obtain relief touching the land, Harper is made to disclose for the first time that he has no title; that he had held himself out to the world as a purchaser of the land, when it turns out he purchased for the judgment creditor, under voidable process, the defects of which he knew, and under circumstances which render his purchase void in equity, as this court has held in *Cook* v. *Toombs*, before cited.

In regard to creditors of Shields, the administrator, and the widow claiming dower, Harper has no equity at all; and without examining how far the proof sustains the charge of fraud between the widow and the administrator, and Moody claiming as a creditor, it is sufficient to say that Harper is not the man to question their acts. His bill should be dismissed, or the relief asked by him denied. The cross bill of the widow claiming a right to dower (Harper has not been in possession long enough to set the statute in motion as to her: he obtained possession in 1856), and Work the administrator, and Moody the creditor, asks that Harper's title be declared null and void.

It matters not whether the widow assigned her dower interest to Moody or not; if Moody succeeded her dower right, that right has never been the subject of controversy until now, and so far as the record shows, it is an interest not originating in any fraud.

The title of the administrator is established by the court having jurisdiction of that matter and all questions concerning it. The

estate is declared insolvent as to personalty, and this record shows that the debts have not been paid off. Rain's judgment still exists, and Moody has proved a debt to the satisfaction of the Probate Court. The interest of the administrator is sufficient to entitle him to come into equity, to remove obstructions and hindrances to a sale; and Harper's claim of title is an obstruction.

There is no estoppel or conclusion by decision, to prevent these parties from insisting on the relief asked for in the cross bill, in respect to the sale to Harper.

As to the claim of Moody for compensation for his improvements, this rests upon distinct grounds, and does not depend on the question of title.

Before the passage of our statute giving to innocent purchasers of defective titles the right to claim the value of improvements erected in good faith, courts of equity recognized this right in every case where, after judgment in ejectment, the party recovering possession came into court for any relief against the defendant touching the land recovered. The cases of bills to have an account of rents and profits, and relief respecting the title, are given as illustrations, and are not intended to limit the principle. The principle is, that he who seeks equity must do equity. Story, Eq. Jur. § 644, and note p. 691.

If the plaintiff, after recovery, by which he has obtained the labor and money of the defendant for nothing, comes into court to ask for relief against the defendant, touch the property,—especially if he founds his claim to relief on the sole ground that the judgment in ejectment is conclusive in his favor, justice requires that he should make compensation to the defendant.

But the doctrine is not confined to cases in which the plaintiff seeks relief. The defendant has an independent right to the value of his improvements. Judge Story himself, while in his text he says the doctrine rested on cases in which the plaintiff sought relief against the defendant, when he came to decide the question, said, no case could be found where the independent relief had been denied, and the principles of equity required that it should be granted. *Bright* v. *Boyd*, 1 Story Rep. 478. The doctrine has been accepted with approbation by other courts. *Herring & Boyd* v. *Pollard's Ex.* 4 Humph. 364.

The statute obviously recognizes the right to improvements as a right not dependent on the claim for rents.

Harper filed this bill about the time he commenced his action for mesne profits. It was Moody's right to assert his claim in either form, for it cannot be said that the jurisdiction in equity was affected by the statute allowing the claim for improvements to be made at law. Moody was not allowed to offer proof in the action at law, because he had not given the notice required, and consequently he set up the claim in equity.

It cannot be said, that because he did not avail himself of the claim as an offset to the rent, he is to be deprived of the claim. It would be absurd to hold that our statute allows offsets in other cases as obligatory on the holder of the claim, so as to work the forfeiture or loss of the claim, if by a defective notice he was not allowed to prove it on the trial.

The Act of 1846, Hutch. Code, 856, is not the origin of the right of the innocent purchaser without notice, to the value of permanent improvements. If we examine the doctrine of the courts of equity, it will be seen that they administered justice in this respect between the plaintiff and defendant in ejectment. The privilege given by the statute in the mere remedy, did not affect the power of the courts of equity to administer relief in a proper case.

The charge of fraud and collusion between Work, Moody, and the widow, is denied in the answers, and the only proof offered in support of it is the letter of Moody to Mrs. Hill. This letter does not prove the charge. This letter of Moody to the heir does not place him in so bad a light as that in which Harper stands, who bought the inheritance of the heir for a mere song, and gave her no notice of his intention.

*Jno. D. Freeman*, on same side, filed an elaborate brief.

*George L. Potter*, for defendant in error.

This case, submitted on final hearing, stands thus:

Harper files his bill, asserting title to certain lots, and produces, as exhibits, the record evidence of his title. He shows a fraudulent attempt, on the part of Work and Moody, to procure a sale of those lots, under form of law, through the Probate Court of Copiah

county; and a fraudulent attempt of the same parties to assert a pretended dower claim of Sarah Shields in the same lots, through the Probate Court of Hinds county. He seeks the protection of a court of equity, by a perpetual injunction against these fraudulent proceedings. This is the whole scope and purpose of his bill. In order to show the litigious character of the defendants, with regard to this very property, and in how far all possible matters of controversy, in relation to it, have been settled in his favor, and against the defendants, and in order to develop more clearly the frauds now complained of, Harper gives a history of his title, and of the litigation with defendants concerning it.

He shows that, in 1844, he purchased the lots at sheriff's sale, under a judgment in favor of *John Rain* v. *C. C. Mayson, John Shields et al.* That, as such purchaser, he sued and recovered the lots from Moody, in ejectment, and the judgment was affirmed. That Mrs. Shields and Mrs. Hill, widow and daughter of John Shields, appeared by counsel, pending the trial in ejectment, and moved to set aside the sale so made by Harper, and to quash the execution under which he purchased, on the ground that John Shields was dead when that execution issued. He shows, that in that trial Moody claimed title only as a purchaser under executions against Shields, and that his pretended title was adjudged void.

The bill shows the next step was a bill by Moody, Mrs. Shields, and Mrs. Hill, to enjoin this judgment, on the ground of the death of Shields, and of the satisfaction of the Rain judgment by a previous sale of the slaves of Mayson; that this bill was dismissed on demurrer, and the decree affirmed on appeal; that then Harper sued Moody, and recovered judgment for mesne profits of the lots; that in that action Moody attempted to claim for his improvements, as an offset to the claim for rents. Transcripts of these cases are made exhibits. Such is the nature of his claim as shown by the bill.

Before we proceed further, as to the claim of complainant, let us see what are the cross-claims for relief, made by the defendants, by their answers as cross-bills. The matters which they urge, as a defence to the relief prayed by complainants, will be considered in its proper place. We now speak of the relief sought by defendants. And first, we will consider the claims made by Moody to set off his

claim for improvements against the judgment for mesne profits. This claim is bad, and the court has no jurisdiction over it, for several reasons.

1. Such a claim cannot be made by cross-bill in answer. In *Ladner* v. *Ogden*, 2 George, 332, it was held that a cross-bill would not lie, for any relief upon any matter which was not made the subject of controversy in the original bill. The matter of the cross-bill must be the matter on which the original bill seeks relief. Harper seeks no relief on the judgment for mesne profits. It constitutes no part of the claim made by the original bill. Cross-bill must relate to matters put in issue by original bill. Story's Eq. Plead. §§ 389–398.

2. This matter has been already adjudicated. It was matter of defence against the claim for mesne profits, and was rejected, because not properly presented. See the transcript, and the opinion of the High Court, in the case on that appeal.

If it be a matter of equitable cognizance, it should have been presented in the bill they filed to enjoin the judgment in ejectment; and this is another and second adjudication against them on this same claim. We say it is such adjudication, although it was not presented in that case; because the rule is, that if a party having a claim, which he might have embraced in his bill, fails to set it up, the decree is conclusive as to such omitted matter, and he cannot bring it forward in a subsequent bill, and have relief upon it. This is upon the equitable rule that a party shall not have two bills for the same matter, when the subject of the two bills might have been embraced and settled in one suit. *Stebbins* v. *Stewart*, 30 Miss. 66.

3. The rule in equity, on which defendants rely, does not justify the set-off in a case like this, even if they could avoid the objection we have taken to the presentation of it by cross-bill. They rely on a passage in 2 Story's Equity Jurisprudence; but it does not sustain them. A perusal of the whole section of which they read a part, and of the notes thereto, will show the cases in which an innocent party may have allowance in equity for the value of his improvements, against a claim for rents. The author says explicitly, that such offset cannot be claimed by a bill filed for that purpose, but only, as a matter of defence, in certain cases; and the

Moody v. Harper.

cases in which such offset is claimed, even as a defence, are only two. One is where the owner comes into equity to recover the land, on an equitable title, and by a decree of the court. In such case, the court will not turn the defendant out of possession, without allowing him, in a proper case, for his improvements. The other case put by Story, is where the owner files his bill for an account of the rents and profits; that is, where he seeks, from the former *bona fide* occupant, a decree for the rents. In this case, we seek neither of these. We seek no decree for rents; we seek no recovery of the lands; but show we have already recovered it, save in possession of it, and our only object is to enjoin proceedings gotten up to harass and defraud us, and cloud our title. The case is therefore not within the rule relied on by defendants.

4. This offset is not allowable, for another reason. The improvements were made after the death of Shields, and before the title of Harper accrued; so that Moody had no equity against Shields for the improvements, nor against Harper, who had no claim to the lots when they were made. In the few cases where equity will set off the improvements against the rents, the court proceeds upon the ground that the owner ought to allow for them; that it would be unconscientious for the owner to turn the party out, or claim rent, and not allow for improvements. But such is not the case with Harper, who claims, by execution-purchase, the title of Shields. The law holds Moody bound with notice of the judgment of Rain as a lien on the lots, and he cannot say he made the improvements without such notice. Harper claimed no rents for the time when the improvements were made, but only from his purchase, at which time it was the duty of Moody, in law and conscience, to surrender the possession to him. Could Moody excuse his refusal to deliver possession to Harper on the ground that he had made the improvements before Harper's purchase? Clearly not. How, then, can he claim a right in equity to offset those improvements against Harper's claim, that he shall pay rents from the time when he ought, in equity and good conscience, to have surrendered possession?

5. This claim of set-off is the joint claim of Moody and Mrs. Shields; and as Mrs. Shields has no interest in such set-off, it is plain that a cross-bill, on their joint claim, cannot be sustained.

For each and all of these reasons, this claim for relief must be rejected. The court cannot grant it.

The next relief claimed by Moody and Mrs. Shields is, that the Rain judgment, the sale under it, the deed to Harper, the judgment in ejectment, and the judgment for mesne profits, be declared void, and annulled and vacated.

This is a joint claim made by them, in which, as the case shows, Mrs. Shields has no interest; and it is obnoxious to the objection above stated. But let us consider the special grounds on which this extraordinary relief is claimed.

1st. It is claimed because Mayson died before the forfeiture of the bond ; and it is said that no judgment on bond forfeited, could be lawfully rendered against him. Very well ; a judgment on forfeited bond never exists as a formal adjudication, but only by operation of law ; and if, in such a case, a judgment exists against the dead man, by operation of law, it must, of necessity, be a good judgment ; for the law renders it. And if, in such a case, there could be no lawful judgment against Mayson, then there was no judgment, by operation of law, against him. We therefore leave Mayson out of the case, and inquire if a valid judgment existed against Shields, whose property Harper purchased. The statute declares that such judgment shall go, on a forthcoming bond, if the condition is broken, if the property be not forthcoming ; and if it was not produced, as the sheriff certifies it was not, the bond was forfeited. What was the consequence ? The law says such forfeiture creates a judgment. Defendants say it could create none against Mayson, but no reason has been or can be suggested why the forfeiture did not create a judgment against Shields. He was both in default and in being, and surely the law could and did operate on him. To hold otherwise would disturb titles to a vast amount of property, and render the statute inoperative in many cases. If there was no judgment on the bond against the survivors, the result would be that the original judgment continued in force, and when it was revived and a new levy made, a new bond might be given, and the creditor thus be put to the delay of two bonds in the same case.

But this is immaterial in the present case. We might admit the judgment to be void, and it would not now avail Moody or Mrs.

Shields. It would not avail Mrs. Shields, because, in 1840, she sold all her interest in the lots to Moody. She has therefore no interest in the controversy. It would not avail Moody, because it was plainly a matter of legal defence in the action of ejectment, and no excuse is shown why it was not made, and there is no pretence that the fact could not, by the use of mere ordinary diligence, have been ascertained in time for that suit. A party cannot come into equity on a matter of legal defence, existing before judgment, unless he shows diligence in making his defence at law.

Again, in the bill filed by Moody, Mrs. Shields, and Mrs. Hill, the parties sought the same relief as here, and there is no pretence that they used due diligence to ascertain the facts as to the death of Mayson, or that by the use of the most ordinary diligence the facts could not have been learned when that bill was filed. Harper avers and the proof shows that Mayson and the parties lived in Jackson, and his death was a matter of public notoriety. They have even gone so far as to prove, by a witness in this case (Whitesides), that the very day of Mayson's death is registered on his tomb in the public graveyard at Jackson. It is idle, therefore, and an attempt to abuse justice, to pretend that this matter can be now litigated.

Upon this point we say further, that it is not a proper matter for cross-bill in this case. What is the purpose of the original bill as to Moody and Mrs. Shields? Simply to prevent them from obtaining in her name an allotment of dower to cloud the title, when the fact is that she has no interest, but has sold out to Moody; and all claim to dower, by or through her, is long since barred by limitation. This is, in law, a fraud on Harper, and when he attempts to prevent that fraud, they cannot by cross-bill assail his title.

The next claim is to avoid Harper's purchase, his deeds, and judgments, because of the death of Shields. This they attempted in the ejectment suit and in the former chancery suit; and in both it was decided against them. It is a point adjudged both at law and in equity, and cannot be relitigated. The High Court held it was no defence at law, and that a court of chancery could not act in the premises. See opinion, which declares that the validity of the sale could not be assailed " in that collateral manner," the precise manner now attempted.

Again, they say the purchase of Harper was champertous, and a fraud upon Rain. As to this point, our objection for want of due diligence in not making the defence at law applies. There is no pretence that the facts could not, by due diligence, have been ascertained, nor that any diligence was used.

But there was no champerty or maintenance. The authorities they cite show that the agreement, to be champertous, must be made before suit brought, or during the pendency of the suit; and the case in 8 Yerger is express to the point, that such agreement as was made in this case is not champertous; and the plain reason given is, that it was made after suit, after judgment. 8 Yerger, 489; 4 Black Com. 184; *Murphey* v. *Sloan,* 24 Miss. 658.

But, if the agreement be champertous, to what did it refer? To these lots? No; but to a division of the money to be collected on the Rain judgment. (See the agreement.) There was no agreement touching the lots, and it is vain to say Harper's purchase of them is affected by any illegal agreement as to money.

As to alleged frauds against the Rains, it might suffice to say they do not complain, and this court must cease to be a court of equity, or reason, before it can enter a decree for Moody, upon the plea that Harper cheated Rain. Was such bold pretence ever before heard, that these lots should be decreed to Moody, simply because Rain is entitled to them?

But all pretences on this point are annihilated by the proof. The first cross-bill avers that Harper was not the attorney of John Rain. The answer, in response, avers that he was. The second or last cross-bill avers that he was attorney for neither John nor Hugh Rain; and the answer, in reponse, avers that he was. There is no counter proof, and therefore the answers stand as proof of those facts. But we have other proofs. The assignment of the judgment made by John Rain to Hugh Rain recites that the Rain judgment was in Harper's charge for collection. John Rain thus admits that Harper was his attorney. Hugh Rain, by his two settlements, admits that Harper was his attorney, and also full knowledge of his acts, and Brooks proves that Hugh Rain knew of and approved the acts of Harper, and that he employed him. Dr. Farrar also proves the retainer.

Ratification, or long acquiescence of the principal, renders valid a purchase by an agent. Story on Agency, § 210.

The proof also shows that, in 1843, Hugh Rain had the receipt of Hughes as attorney, for collection of the claim against Mayson. He held the receipt, and claimed as assignee. Brooks, his agent, then delivered it to Harper.

This disposes of all the claims made by Moody and Mrs. Shields for relief.

We now come to defendant Work.

He seeks relief against Harper on the ground that he, Work, is administrator of John Shields. As such, he seeks to vacate Harper's titles, &c. But he seems to have forgotten that an administrator *de bonis non* cannot, as a matter of course, assail the title of a third party to land formerly owned by the intestate. As a general thing, the administrator has nothing to do with the land of the decedent. He may, in a proper case, subject it to pay debts. But Work seems to think he is either the heir of Shields or the confederate of Moody, and he accordingly assails Harper's title; but he shows no reason why he assails it as administrator, in which capacity alone he can be heard. There is no pretence of a necessity existing to sell this land to pay any valid debt against Shields. The only claim suggested by him, as a reason for his application for administration, was an alleged debt due Moody, and the record shows it was a protested draft due more than eighteen years ago; it is barred thrice over, and there is no pretence that Shields had notice of protest, or was ever liable upon it. The administrator cannot obtain an order to sell lands to pay a debt barred by limitation. *Henderson* v. *Ilsley,* 9 S. & M.; *Wellman* v. *Lawrence,* 15 Mass. 58, 326; 16 Ib. 172, 429.

That this claim is barred is clear. It fell due in Shields's lifetime. Le Grand administered on his estate, and might have been sued, &c. Where the statute begins to run, it runs on. It was also barred because not duly presented to Le Grand. It is agreed in the case that Le Grand made due publication for the presentation of claims. As Work claims relief on cross-bill, he must aver, in that bill, and prove all facts necessary to the relief he asks.

Again: the transcript of Le Grand's administration shows a large amount of personal assets unappropriated. It is immaterial how

these were lost.   Until due excuse be shown, the land cannot be sold.   If an administrator wastes the personalty, creditors cannot enforce sale of lands.

Again : all of them assail Harper's title on the plea that a previous execution on the Rain judgment was levied on slaves of Mayson, and that the judgment was satisfied.   But the fact is, that in all the cases to which that money was appropriated, there were judgments of the same date as Rain's judgment, and all were levied at the same time on those slaves, and they were sold under all of them. This was proved by the original papers in those cases produced at the hearing.   All were, therefore, equally entitled to the money; and there is no pretence that the Rain judgment was satisfied. This was a matter relied on in the trial in ejectment and also in the former chancery suit; and the High Court held the sale good upon same proofs now made.

As to the pretence that no valid court was held at the term of the Rain judgment, nothing need be said; it is idle.

We have thus shown that, in so far as any of these parties claim relief against Harper, their claims cannot be regarded, and their cross-bills must be dismissed.

It only remains to show that Harper is entitled to a perpetual injunction against the proceedings in the Probate Courts.

As to the proceedings in Copiah, all there was done on the same day.   Work and Moody were present.   Work applied for administration on plea that the estate owed Moody.   Moody went his security on administration bond, and probated that famous claim which lacked but three years of reaching lawful age.   Thereupon, and to pay that outlawed claim, Work obtained an order to sell Harper's lots,—the very lots which he had then just recovered against Moody after long litigation.   Moody had been defeated both at law and in chancery, and was constrained to apply to some other tribunal.   He selected the Probate Court, and this trick of selling this land, through the agency of Work as administrator, to pay this pretended claim which he fails to produce, as Harper has required, was concerted.   In view of such facts, it is vain for them to swear to their innocence.   But I care not whether they intended a fraud or not—a legal fraud it is beyond peradventure—and as shown, there having been a large amount of assets, the land cannot

be sold.  It is idle to say a court of chancery has not jurisdiction in such a case to prevent the consummation of this fraud, and to prevent a cloud from being cast over Harper's title by such a sale. Nor is it any infringement of the jurisdiction of the Probate Court. It has no jurisdiction to order a sale of land, except by statute, as to pay debts, in a proper case; and the proof shows there are no debts existing.  Our bill does not seek to interfere with the rightful functions of that court, but only to prevent these defendants from fraudulently using its process and orders.   Besides, Harper is not a party in that court, and cannot appear there to contest with them and defeat their fraudulent schemes.   He is, therefore, compelled to resort to chancery.

The same reasons are a full answer to all objections to our claim to enjoin the fraudulent proceedings in the Probate Court of Hinds. There Moody, Work, and Mrs. Shields are at work, on the false pretence that she is entitled to dower, when the proof shows that, in 1840, she sold out to Moody, and her claim, if it existed, was long ago barred by limitation.   See Smedes & Marshall, Ch. R. 494; *Berrien* v. *Conner*, 1 Harrison N. J. R. 107; *Tuttle* v. *Wilson*, 10 Ohio, 24.

This proceeding is on a false and stale claim, but Harper cannot appear in Probate Court to oppose it.  He must resort to chancery.

On review of the whole case, we submit that the injunction must be made perpetual, and Moody and Work taxed with all costs.

Judge Harris relied on *Robertson* v. *Demoss*, 23 Miss. 298 to show the Rain judgment was barred ; but that case shows it would not be barred even as to the administrators, so long as its lien existed ; and there is no pretence to say it was barred as to the heir of Shields and the land.

HANDY, J., delivered the opinion of the court.

The original bill in this case was filed by the defendant in error, to enjoin certain proceedings in the Probate Courts of Copiah and Hinds counties, in relation to some town lots in the city of Jackson, alleged to be the property of the defendant in error, and in his possession ; which proceedings were a cloud upon his title.   The parties defendant to the bill were Edwin Moody, George Work, administrator *de bonis non* of John Shields, deceased, and Sarah Shields, the widow of John Shields.

The bill states, in substance, that Harper purchased the lots in February, 1844, at sheriff's sale, made under an execution against John Shields and others; that Moody had previously purchased the same lots at execution sale, made by the sheriff under judgments of junior date and lien to that under which Harper purchased; that Moody, being in possession, Harper sued him in ejectment, and recovered judgment against him, which was affirmed in this court; that on the 20th April, 1854, Moody purchased from one Susan P. Hill, who claimed to be the only heir of John Shields, all her right and title to these lots, having previously, on the 18th February, 1840, purchased from Sarah Shields, the widow, all her right, title, and interest in and to the lots, and received from said parties conveyances of their interests; that on the 22d April, 1854, a bill was filed in the Superior Court of Chancery, by Moody, and Susan P. Hill, claiming as heir, and Sarah Shields, claiming as widow of John Shields, against Harper, claiming title to the lots, alleging that the execution under which he purchased was void, and his purchase fraudulent; because the execution under which he purchased had been satisfied, and because the judgment had not been revived against Shields; and praying an injunction to restrain the issuing of the writ of possession in favor of Harper, upon the judgment in ejectment recovered by him; to which bill a demurrer was filed, which was sustained by this court, and the bill dismissed; and this is relied on as a final adjudication in favor of the title of Harper, and against the claim of the complainants in that bill; that on the 16th July, 1856, Moody surrendered possession to Harper, who has since continued in possession.

The bill further charges, that at the August term, 1856, of the Court of Probates of Copiah county, Moody and the defendant Work, for the purpose of creating clouds and incumbrances on the title of Harper, and of harassing him, fraudulently procured said Work to be appointed administrator *de bonis non* of John Shields, Moody becoming surety on his bond; and Work immediately filed a petition in that court for the sale of the said town lots, as the property of John Shields, for the alleged purpose of paying a pretended debt of said Moody, for about $5000, against the estate, which claim is alleged to be founded on a claim for $1700 44, due by John Shields on the 26th April, 1839, and is alleged to be

fictitious, or at least long since barred by the Statute of Limitations, and the bill calls for the production of the evidence of the debt; that, for the same fraudulent purpose, Moody, Work, and Sarah Shields filed, in the Probate Court of Hinds county, at October term, 1856, an application, in the name of Sarah Shields, for the allotment of her dower in said lots, Work waiving the issuance of citation as administrator of John Shields, and acknowledging notice; and thus secretly obtained an order for the allotment of her dower, without notice to Harper, notwithstanding Sarah Shields had conveyed her interest in the lots to Moody in the year 1840; that said claim of dower would at all events be barred by the Statute of Limitations, more than sixteen years having elapsed since the death of John Shields; and Moody's claim thereupon is also barred by the statute, in relation to possessory actions. The prayer is, that these proceedings in the Courts of Probates be set aside as fraudulent, and as clouds against Harper's title, and that all further proceedings thereon be enjoined.

In the progress of the cause, Moody and Work demurred to the relief prayed in the bill, on the ground that the matter was exclusively cognizable in the Probate Courts, and beyond the jurisdiction of a court of chancery. They answered the other allegations of the bill, denying the charges of fraud and the title of Harper, and insisting that the dismissal of the bill in chancery, filed by Moody, Hill, and Shields, is no bar to the defendants' setting up a valid title to the lots, because Susan P. Hill and Sarah Shields were mere nominal parties to that bill. Moody's answer was also made a cross-bill, and he afterwards filed an amended answer and cross-bill, in which he claims relief against Harper, upon the following grounds: 1st. That the judgment under which Harper purchased was void, because after signing the forthcoming bond on which it was founded, and before it was returned forfeited, Mayson, the principal, died. 2d. That Shields had died several years before the sale under the execution, and after administration granted on his estate, and there was no revival of the judgment against his administrator or heir, and the judgment was never probated or presented to his administrator. 3d. That Harper had no interest in the judgment, and had no authority to control it, being neither agent nor attorney for Rain, the plaintiff; and, without his know-

ledge, that Harper procured the execution to be issued, not for the purpose of collecting the money, but for the purpose of purchasing the lots at a sacrifice, and fraudulently to deprive Moody of them; and that he accordingly purchased them at sheriff's sale for ten dollars each, for his private benefit and as a speculation; and that Moody has discovered these facts since the decision of the suits at law and in equity, between the parties in relation to the lots. 4th. Admitting that since the institution of this suit, Harper had recovered, in an action at law, the sum of $2811, for the rents and profits of the lots, but insists that the same was fraudulent, because Moody had a good set-off thereto for valuable improvements put upon the premises in ignorance of Harper's claim, but was prevented, by Harper's violation of an agreement in relation to the trial of that suit, from availing himself of his just claim; that he also paid taxes on the property, and paid Mrs. Shields about $400 for her dower interest, and Susan P. Hill $80 for her interest, and the sheriff about $460 for the purchase-money, at the execution sale at which Moody purchased. He claims these sums as a set-off to the judgment for mesne profits, and prays that the title of Harper be declared void, that the judgments in ejectment and for mesne profits be set aside, and that Moody be restored to possession of the lots; and if mistaken in this, that he be allowed to set-off his claim for improvements and expenditures against the judgment for mesne profits.

To these cross-bills Harper answered, insisting that the dismissal of the bill in chancery of Moody, Hill, and Shields, is a final adjudication against the title of Moody here set up, and conclusive against him; denying that he had not authority to issue the execution under which he purchased, and setting forth the facts of his retainer in the matter; that he was an attorney-at-law, and agreed with the agent of Hugh Rain (who claimed to be the assignee of John Rain, and was the holder of the attorney's receipt given to John Rain for the collection of the debt before the institution of the suit), that he should proceed to collect the money by execution, and that he agreed to "take a conditional fee of one-half of what could be made out of the judgment;" and subsequently to the sale under the execution, that the assignment to Hugh Rain was recognized by John Rain, and that Harper also had the authority of the attorney who

Moody *v.* Harper.

obtained the judgment for the management of the execution; that the purchase was made for the joint benefit of Harper and Hugh Rain, the assignee, who fully sanctioned it, and that it was the only means of satisfying the judgment. He denies that the judgment for mesne profits was obtained by fraud or by the violation of any agreement with Moody; and states that that matter was considered upon the respective affidavits of the parties offered upon a motion for a new trial in that cause, which motion was overruled in the Circuit Court, and the judgment for mesne profits affirmed in this court, which is relied on as conclusive against the claim of Moody for improvements here set up; he further states that Moody had notice of his title before the alleged improvements and expenditures were made. He insists that Sarah Shields and Susan P. Hill have no interest in the lots, having conveyed their interests to Moody.

The court overruled the demurrer to the original bill, dismissed the cross-bills, and decreed a perpetual injunction against the proceedings of Work and in the name of Sarah Shields in the Courts of Probates.

The first question naturally arising in the order of the proceedings in this record, and that which we will first consider, is the error assigned upon the decree overruling the demurrer to the original bill. This assignment of error not only presents the question of the propriety of the decision upon the demurrer, but it also involves the question of the correctness of the final decree granting the relief prayed for in the bill.

The bill prays an injunction, first, against the proceedings in the Probate Court of Copiah county, taken by Work, as administrator of Shields, for the sale of the lots in controversy; and, secondly, against the application in the name of Sarah Shields in the Probate Court of Hinds county. As to the proceedings in Copiah county, it alleges that the debt due to Moody, which is set up as rendering it necessary to sell the real estate of Shields, is fictitious, and calls for the production of the evidence of it. It is not exhibited with the answer. But the bill states its date and amount, and alleges that it is barred by the Statute of Limitations. This is admitted by the demurrer. It therefore appears that this application to sell the lots in controversy, is made for the purpose of paying a debt

which cannot be legally asserted against the estate of John Shields, and to which the administrator could not properly apply the proceeds of the sale, if the lots were sold.   It is clear that no such order of sale should be granted by the court; for it would be to order the sale of the land for a vain and idle purpose.   The sale could only have the effect to create a cloud upon the title of Harper; and the circumstances of the application well warrant the conclusion that such was its object, and not the payment of the just and legal claims against the estate of John Shields.   As the proceeding, if consummated, would have that effect, it was proper for the defendant in error to arrest it, and to prevent the jurisdiction of the Probate Court from being abused to his prejudice, by the aid of equity enjoining its consummation.   It was clearly a cloud upon his title, inequitable in its character, and within the remedial power of a court of equity.   And although it was a case in which the Court of Probates ought not to have ordered the sale, yet the appellee had no right to contest that matter in that court, being a stranger to the jurisdiction; and he had no remedy but in a court of equity, whose jurisdiction in such a case is clear and ample.

As to the application for the allotment of dower in the Hinds Probate Court, in October, 1856, the bill shows that Sarah Shields had conveyed her right of dower to Moody in the year 1840, and sets up as a bar to the petition, the Statute of Limitations in relation to promissory actions.   It thus appears that the widow had failed to assert her claim of dower for about sixteen years; and her claim is thereby barred by the statute.   Smedes & Marshall Ch. Rep. 494; *Berrien* v. *Conner*, 1 Harrison (N. J.) 107; *Tuttle* v. *Wilson*, 10 Ohio, 24.

But, regarding this application as made at the instance of Moody and for his benefit, as, under the circumstances, it must be, it is to be taken even with less favor, as he did not avail himself of it by way of defence of the action of ejectment, nor in the bill in chancery filed by him, though he then had a conveyance of her interest. In the latter suit, he recognizes the right to the lots as still existing in part in her, and in his cross-bill in this case he admits his purchase of her interest, and claims compensation for what he paid for her dower interest conveyed to him.

Under all these circumstances, the application for dower was a

mere cloud upon the title, which it was within the power of a court of equity to remove.

For these reasons we think there was no error in overruling the demurrer.

The next question is, whether the court erred in dismissing the cross-bills of the plaintiff in error? In determining this question, we have to consider the several grounds set up in these cross-bills for relief, either in whole or in part, against the claim and title of the defendant in error.

In the first place, it is insisted in these cross-bills that the execution under which Harper purchased, the sheriff's deed to him, and the judgments in ejectment and for mesne profits, should be declared void and annulled, 1st, because Mayson, the principal obligor in the forthcoming bond on which the judgment was rendered, was dead at the time of return of forfeiture of the bond, and the judgment was void as to him; and being a joint judgment against him and Shields and Craft, the other obligors, it was also void as to them; and hence that the execution, sheriff's sale, and title thereby acquired by Harper, are without any foundation in law, and utterly void.

The force of this objection depends upon the mode in which judgments on forfeited forthcoming bonds become such, and have the force and effect of judgments under our laws. Upon the forfeiture of such a bond, the sheriff is required to make return of it, on the return day, to the court from which it issued, with the execution; and thereupon it shall have the force and effect of a judgment. There is no judgment rendered by the court in terms, nor entered upon its records, against the parties by name, as in the case of ordinary judgments against parties by the rules of proceeding at common law; but the return has merely the force and effect of a judgment. It can only have such effect upon parties against whom it may legally operate; and, though it may not have legal effect as a judgment, against one of the obligors by reason of his death, that would not prevent it from taking effect as a judgment against another obligor, who was liable upon it. There being no express judgment, it would be taken to have effect upon parties against whom it might legally operate, and to be inoperative as to others against whom it could not legally take effect; and as to the latter

persons, the judgment being inoperative in case of their death, the matter would stand as in the case of an ordinary suit where one of several joint defendants had died pending the suit, and the proceeding would be considered as dismissed as to the deceased party. In cases like this, no judgment is rendered except by operation of law; and, of course, no judgment can be considered as rendered except such as might be legally rendered. Hence, in judgments rendered on forthcoming bonds under our laws, it does not vitiate a judgment, which passes by operation of law upon the return of a forfeited forthcoming bond against one of the obligors, that another is dead and incapable of suffering judgment. In such case there is no positive judgment rendered; and there being no positive proceeding in court, and no express judicial action, there can be no opportunity for the plaintiff to dismiss the proceeding against the deceased obligor, as in ordinary suits, and great injury might arise to plaintiffs, who are ignorant of the death of the obligor, and even of the return of the bond.

We, therefore, think that the rule applicable to ordinary suits and judgments cannot be justly applied to cases of this sort, and that it must be taken that no judgment was rendered against the deceased party.

The second objection taken to the execution and the title derived from the sale under it is, that the execution was irregular as to Shields, who was dead before it was issued or bore *teste;* and it never having been revived by *scire facias,* a sale under it was irregular as to Harper, who had it issued and acted as attorney for the plaintiff, and conferred no title on him. Against this position, the defendant insists that the judgment at law and the decree dismissing the bill filed by Moody in which this ground of relief is set up, are conclusive, and that the plaintiff in error could not be heard in his cross-bill to raise this objection again.

It is urged by the counsel for the plaintiff in error, that it was first brought to light by these cross-bills that Harper did not make the purchase for himself, but for the plaintiff in execution; and as it now appears that he was purchasing for a party who is chargeable with all the irregularities of the execution, that the previous decisions cannot affect his equitable rights under this newly disclosed state of facts. But the rule charging parties with the consequences

of irregularities in executions, is as stringent against attorneys who issue and control the executions and purchase at sales made under them, as it is against the plaintiffs who become purchasers.  Here the record of the execution under which Harper purchased, contained an indorsement showing that he had the control of it ; and the bill filed by Moody, Shields, and Hill showed that the execution was issued by Harper, and the return upon it shows that he purchased the property and paid the costs.  The previous bill, therefore, fully showed that he was the active agent and attorney for the plaintiff in the execution.  That case presented the same objection to the regularity of the execution, and sought relief against the title derived from the sale under it, upon the same ground of irregularity as is here raised ; and the objection was as available upon the facts stated in that bill and appearing by the records to which it referred, as upon the allegations of these cross-bills.  Yet the irregularity was held to be insufficient to vitiate the title of Harper, and the bill was dismissed.  *Harper* v. *Hill et al.* 35 Miss. 63.  It cannot, therefore, be said that that bill was founded on a different state of facts, as it regards the objection under consideration, from those here presented ; and upon well-settled principle, we consider that decision as a conclusive adjudication of this objection, which the parties are not to be permitted to relitigate by adducing new arguments in support of it, or by relying on a state of facts not materially different from those there presented.  *Stewart et al.* v. *Stebbins*, 30 Miss. 66; *Manly* v. *Kidd*, 33 Ib. 141; *Moss* v. *Davidson*, 1 S. & M. 144.

It will not be permitted to the plaintiff in error now to say, that Shields and Hill were mere nominal parties to that bill; for it is plain that a substantial right was claimed therein in their behalf, one as the widow and the other as the heir of John Shields, suing conjointly with Moody ; and there is much greater reason for regarding Sarah Shields as a nominal party in the state of facts presented in this case than in that; for it is here shown that she had conveyed her interest in the property to Moody by regular deed in the year 1840.

The next ground of relief set up in the cross-bills, is the claim of Moody for improvements put upon the lots, and expenditures made on account of them.  This is resisted by the defendant in

error on the ground that it is concluded by the two judgments at law, and the decree dismissing the bill in chancery.

In regard to the judgment in ejectment, it does not appear that any effort was made by Moody to avail himself of this claim. It was entirely competent for him to do so in that suit, not merely to the extent of setting off so much of his claim as would cover the damages to be recovered by the plaintiff for rents and profits, as is suggested by counsel for the plaintiff in error, but to the full extent of the value of such improvements as were allowable as a charge against the premises. Hutch. Code, 856, Art. 13, §§ 1, 2, 3. No excuse is shown, in these cross-bills, for the failure to assert the claim in that action; and upon plain principle, he cannot afterwards come into equity to assert it.

As to the action for mesne profits, the cross-bill alleges that it was set up in that case; but by reason of the fraudulent conduct of Harper in forcing on the trial, in the absence of Moody and of his witnesses, to prove the claim, and in violation of an agreement made between them in relation to setting a day for the trial, that he was prevented from establishing his claim. This charge of fraudulent conduct and violation of agreement, is denied by Harper in his answer to the cross-bill; and it appears by the record of the suit, that it was made the ground of a motion by Moody for a new trial of the case, and was held by the court to be insufficient or not sustained, and the motion was overruled. That was an adjudication of the matter by a competent tribunal, and must be taken as conclusive. It does not appear that the claim for expenditures on account of the property now set up, was asserted in that suit. That was certainly the occasion on which it should have been brought forward; and having failed then to do so, the plaintiff in error cannot afterwards come into a court of equity and seek relief on that ground. Again, in the bill in equity filed by Moody and others, no claim is asserted for these improvements and expenditures. Assuredly, under these circumstances, he cannot now be allowed to bring forward his claim and set it up by cross-bill, asking relief on account of it against the defendant in error.

We do not deem it necessary to express any opinion upon the point, whether, if the previous judgments and decree had not taken place, Moody could have asserted and maintained his claim for im-

Moody v. Harper.

provements and expenditures, upon a bill in equity filed simply for that purpose. It is sufficient to decide that, under the circumstances of the case, he cannot now assert such a claim either for affirmative relief or as a defence to the relief sought in the original bill in this case.

It is urged by counsel that, although he might not have been allowed to file his bill in equity and set up this claim, considering the previous litigation, yet he is not thereby debarred of making his defence on that ground and claiming the benefit of his equity in a suit commenced by Harper, and involving his title to the property and his equitable rights growing out of it ; and this on the principle that he who seeks equity must do equity. But this claim is not *a defence* to the relief sought by the original bill, but is wholly independent of it. The whole scope of the bill is to remove the clouds upon the title of Harper. This claim is for allowance for improvements and expenditures upon the property. It does not touch the special relief sought by the bill, but sets up an independent claim *for relief* against the property by way of cross-bill. It is, therefore, a cross-bill purely for relief, and not for defence against the relief prayed in the original bill; and it cannot be maintained except upon the principle which would have entitled Moody to set it up by original bill. As he is precluded under the circumstances from setting it up in that way, it was not proper to be set up by way of cross-bill for relief as it is here asserted.

The next ground of relief set up in the cross-bills is, that Harper had no interest in the execution under which he purchased, and that he procured it to be issued without authority, and to be used for his own benefit in the purchase of the lots and in fraud of the rights of Moody, and that he accordingly purchased them for a trifling sum, which has never been paid to the plaintiff in the execution ; and that these facts have been discovered by him since the previous litigation. The want of authority to act in the enforcement of the execution is fully denied by the answer to the cross-bill; and it is stated that the purchase was made for the joint benefit of Harper and the plaintiff's assignee, in pursuance of an agreement previously made between them, that Harper should attend to the collection of the money upon the judgment, and should receive one-half of what should be made upon it.

It appears to be established by the evidence, that Harper was engaged as an attorney-at-law to attend to the collection of the money upon the judgment, by Hugh Rain, who was the assignee of the judgment previous to the retainer, and was the holder of the receipt given by the original attorneys who brought the suit upon the claim. That was *prima facie* evidence of the assignment to Hugh Rain. But the assignment is sufficiently proved otherwise. A paper is shown, signed by J. Rain, dated 16th January, 1846, stating that he *had assigned* this claim to Hugh Rain, referring to it as in the hands of Harper for collection, and requesting Harper to make payment to Hugh Rain. This paper does not purport to be the assignment which he had made to Hugh Rain, but refers to the assignment as having been previously made; and it is a clear recognition of the authority of Harper to act in the matter. The particulars of his engagement in the business are fully and satisfactorily shown by the evidence; and it does not appear that the party to whom he is responsible denies his authority or disavows his acts, or in anywise complains of his proceedings.

This ground of relief is, therefore, not maintained. And we are of opinion that the cross-bills were properly dismissed.

The next question to be considered is, whether the title of Harper, as shown in his answers to the cross-bills, is void for champerty.

This point is raised upon the statement in the answer of Harper, that he undertook the collection of the money upon the judgment, under an agreement with the plaintiff's assignee that he was to receive as " a conditional fee one-half of what should be made out of the judgment," and that he purchased the lots upon that agreement, there being no other means of making the money.

It is objected that this ground of defence against the title of Harper cannot be sustained as it is here presented for consideration; and that as it was not set up in the previous litigation, and especially in the bill in equity, it cannot be allowed here. To meet this objection, the third cross-bill states, that it was not discovered until the termination of the previous suits. But this cross-bill was not allowed to be filed, and was rejected by the court below when offered. No error is assigned on that ground, and the statements

of that cross-bill cannot, therefore, be considered as affecting the case, and the question must be determined without regard to them.

For the reasons above stated,—there being nothing to excuse the failure to make the objection in the previous suits,—the plaintiff in error is not entitled now to assail the title of Harper on this ground, by way of defence to a bill filed by him for a collateral purpose in relation to the lots, and after his title had been declared valid against the objections which had been raised to it in the several previous suits.

But if the question be regarded as properly presented, the facts of this case do not constitute champerty. That offence is defined to be " a bargain with a plaintiff or defendant to divide the land or other matter sued for between them, if they prevail at law, the champertor undertaking to carry on the suit at his own expense." 1 Bouv. Law. Dict. 250; title Champerty, and cases there cited. In order to bring an agreement within the condemnation of this rule, two things are necessary. 1st. That it be made before the commencement of the suit, and be the moving cause of its commencement. 2d. That it be agreed by the party undertaking it, that he will carry it on at his own expense. Upon both of these points, the present case is not within the rule. For, 1st, the agreement was not made until after the judgment proposed to be collected was rendered. It did not necessarily contemplate the institution of any suit. The object was to collect the amount of the judgment. The plaintiff's rights were fixed by law; and though the enforcement of them might be attended with trouble and difficulty, the duty simply was to enforce the rights of the plaintiff as fixed by the judgment, and not to institute suits, unless the plaintiff's rights should render such a course necessary. The duty of the attorney was, to have the property of the defendant, liable to the execution, sold under it; and the legal presumption would be, that no litigation would be necessary to recover property, the title to which passed by the sale. Hence it cannot be assumed that such an agreement is a contract to carry on litigation, or that litigation is the necessary result of it, and the consideration upon which it is founded. This view is held in *Floyd* v. *Goodwin*, 8 Yerger, 484. 2d. There is no agreement that Harper should bear the expenses

incident to the enforcement of the execution, and in realizing the fruits of it.

Finally, as to the matters of defence urged against the relief sought in the original bill: we consider the proceedings in the Probate Courts as such clouds upon the title of the defendant in error as to call for the interposition of a court of equity to prevent their consummation.    These proceedings must be regarded as taken for the purpose of enabling Moody to take the benefit of the alleged outstanding titles of the widow of Shields, and of his estate against the title of Harper; for there was no necessity or justification for the sale of the lands to pay debts, and the title of the widow had already been conveyed to him.    He had already set up these claims in the suit in chancery, and they had been adjudged insufficient to defeat the title of Harper.    If insufficient as outstanding titles, they should not have been permitted to be clothed with the forms of judicial sanction by an *ex parte* proceeding, to be asserted against an adverse title, when in substance and in equity they were invalid.

We are of opinion that the decree enjoining the proceedings in the Court of Probates is correct, and it is affirmed.