CHARLES E. LEARNED and RUFUS F. LEARNED *v.* JAMES CORLEY.

1. MESNE PROFITS AND DAMAGES—SET-OFF FOR IMPROVEMENTS.—In an action of ejectment, where the plaintiff does not, in his declaration, demand "mesne profits", or " damages," the defendant cannot set-off or plead the value of his valuable improvements on the land, or introduce evidence thereof on the trial before the jury.

2. SAME.—In such action, where the defendant is liable for "mesne profits " or "damages," the plaintiff has his option to sue for them in his action of ejectment, or afterward in a separate action, or not at all; and if the plaintiff chooses not to demand them, the defendant is without remedy, at least in a court of law.

3. SAME.—In the statute which provides that it shall be lawful for the defendant to " set-off or plead " the value of his improvements, the term "set-off " and " plea ", are used synonymously, and are in this connection, essentially convertible terms; and the right to set-off or plead, must be preceded by the demand upon which it is dependent. The subject matter of the set-off or plea is a defense to the demand for mesne profits or damages, and not to the action of ejectment.

4. DILIGENT ENQUIRY—MORAL OBLIGATION.—No man ought to be entitled to these extraordinary benefits of a *bona fide* possession of land, unless he entered and improved, in a case which appeared to him, after diligent and faithful enquiry, to be free from suspicion. There is no moral obligation which should compel a man to

pay for improvements upon his own lands, which he never authorized, and which originated in a tort.

5. REGISTRATION NOTICE TO ALL THE WORLD.—The registry of a deed or any other paper authorized or required by law to be recorded, is notice to "subsequent purchasers" and to all the world ; and where the means of information are of record in the county, and open at all times for examination, the rule of diligence ought to be the more stringent.

6. PRESUMPTION OF DEATH—EVIDENCE OF.—The uncontradicted testimony of the mother that the last he ever heard of her son was that in 1855, he sailed on board a vessel bound for a Spanish port, and that about five days afterward there was a violent storm at sea, and that neither the ship, nor any one on board, has ever been heard of since, and that she is satisfied her son is dead, fully establishes the legal presumption, under our statute, of his death.

7. CONSTRUCTION OF STATUTE.—In the exposition of a statute, the intention of the maker, when ascertained, will prevail over the literal sense of the terms ; and its reason and intention will prevail over the strict letter. Where the words are not explicit, the intention is to be collected from the context ; from the occasion and necessity of the law ; from the mischief felt, and the remedy in view—and the intention is to be taken or presumed according to what is consonant with reason and good discretion. 1 Kent, 461. If the meaning of a statute be doubtful, the consequences are to be considered in the construction, but where the meaning is plain, no consequences are to be regarded. 10 Met., 344.

8. TITLE DERAIGNMENT.—Thos. H. Wheeler bought the land at public sale, made by an administrator, but the sale was never reported to, nor confirmed by the probate court. He never occupied the land, but sold and conveyed by quit claim deed (never recorded or found), to Wiley J. Wheeler, who went into possession and conveyed to Aaron Miller, who conveyed to defendant, Corley. The facts will not enable Corley to present a "claim to the premises, under some deed or contract of purchase made or acquired in good faith," as required by the statute, so as to entitle him to set-off or plead the value of his improvements put on the land.

Error to the circuit court of Copiah county. McNAIR, J.

The facts are sufficiently stated in the opinion of the court.

The plaintiff in error assigned the following errors :

1st. The judgment of said circuit court should have been for the plaintiff.

2d. The judgment of said court for Rufus F. Learned should have been for half of the land sued for.

3d. No judgment should have been given for the defend-ant.

4th. No judgment should have been given for the value of improvements.

5th. Said court erred in overruling the objection to the admission of evidence of the v alue of the improvements.

6th. The finding of the jury on the question of limitation is contrary to law and the evidence.

7th. The finding of the jury on the question of improvements is contrary to law and the evidence.

8th. The court erred in giving the instructions asked by the defendant.

9th. The court erred in overruling the motion of the plaintiffs for a new trial.

*H. B. Mayes*, for the the plaintiffs in error.

The question of title is not involved in this investigation, it having been settled in the case of Learned v. Matthews, 40 Miss., 210. There was no demand in the declaration for mesne profits or damages. The plea was "not guilty," with notice by defendant, that he would offer evidence of the value of improvements, etc. On the trial plaintiffs offered no evidence of the value of mesne profits or damages. The defendant offered evidence of the value of improvements, etc., to which the plaintiffs objected, but objection was overruled, the evidence admitted, and exceptions taken. This ruling of the court is assigned as error, and presents the first question. Rev. Code, p. 386. We insist that unless the plaintiff in ejectment demands his damages and mesne profits in this action, the defendant cannot set-off the value of his improvements. Rev. Code, art., 20, p. 389. But it is otherwise where the plaintiff sues in a separate action for mesne profits and damages. Ib.

In support of these propositions, and in illustration of the rules of law applicable to the action of ejectment, the following citation of authorities is given: Harper v. Moody, 38 Miss., 625, 626; 3 Bl. Com., 166; Ad. Ej., 389, 390, note, *c*; Rev. Code, art. 3, p. 386'; art. 8., p. 387; art. 35, p. 393, 394; Black. on Tax Tit., 603, § 7; ib., 606, § 6; ib., 611, § 49; Black. Com., p. 40, § 1; 1 Kent Com., 5th ed., 462; Dwarvis on Stat., 9 Law Lib., 44, marg., 606; 8 Bacon Ab., Let. J., Com. Stat., 238; Barbour on Set-off, Ch., 1; Bouv. Law Dic., vol. 2, p. 343; 1 Chit. Pl., 525, 526; Bouv. Law Dic., 266; Stephen Pl., 51; ib., 45; Adams Ej., 391; Goodlittle v. Toombs, 3 Wilson R., 11; Ad. Ej., 374, 375; Pr. Dec. Ky., 397; 1 Pitles' Dig., 508, § 1; 2 Bibb., 45; 3 Marsh.,

202; Hardin Rep., 100; Chirac v. Reinicker, 11 Wheat., 595; New Lib., Law and Equity, vol. 1; Broom's Leg. Max., marg., 90; Green v. Biddle, 5 Cond. U. S. Sup. Court Rep., 381, 382.

2d. Is the defendant such a claimant of the premises, under deed or contract of purchase, made or acquired in good faith, as may set-off or plead the value of his improvements? This question was raised in the court below, by instructions asked and given, and is distinctly presented in the record. Touching estates in realty, a question of more profound importance has at no time been presented for the consideration of this court; especially, as to infants, *non compotes,* and other persons under disability. The defendant offered in evidence a deed, dated May 16, 1855, from Aaron Miller to himself with general warranty, and a deed dated October 7, 1850, from Wiley J. Wheeler to Aaron Miller, with general warranty. Thomas H. Wheeler testified that he conveyed to Wiley J. Wheeler by "quit claim deed." A deed was read from the administrator of Edward D. Learned, deceased, the father of the plaintiffs, to said Thomas H. Wheeler. This administrator's deed was held void by this court. Learned et al. v. Matthews, 40 Miss., 210.

Upon this branch of the case, see Angell on Lim., p. 7, sec. 9; Root et al. v. McFerrin, 37 Miss., 51; Hanna v. Renfro et al., 32 Miss., 129; 2 Parson's on Con., 5th ed., title, Estoppel, 798, 799; 2 Kent Com., 6th ed., 337; 2 Sugden on Vend., p. 59, sec. 3; ib., 56, sec. 18; ib., 91, sec. 5; 1 Chit. Pl., 146; 1 Sugden on Vend., p. 8, sec. 34; 3 ib., p. 57, sec. 23; 2 ib., p. 56, sec., 19; ib., p. 59, sec. 4; 3 Sugden on Vend., pp. 333, 334, sec. 57; Henning's Maxims, 90.

Deeds are put of record for the security and convenience of the subsequent purchaser, and to facilitate him in the exercise of that good faith, that diligence, which the law enjoins. The administrator's deed limited to the records of the probate court, and they disclosed the defect in his title, and also disclosed the title of the plaintiffs. Twice forewarned, shall he be called a purchaser in "good faith." On

this point, see the following authorities: Downer v. Fortescue, 3 Atk., 133; Brush v. Ware, 15 Peters, 94; S. W. Reeder et al. v. J. T. Barr et al., 4 Ohio R., 458; Lessee of Cunningham & Cully v. Buckingham, 1 Ohio R., 128; Nelson v. Allen & Harris, 1 Yerger, 366; Ware et al. v. Houghton, exr., 41 Miss., 384; Pope et al. v. Pope et al., 40 Miss., 518; Root v. McFerrin, 37 Miss., 59; Martin v. Nash, 31 Miss., 330; Wailes v. Cooper, 24 Miss., 227; Benson v. Stewart, 30 Miss., 59; Harper v. Bibb & Hopkins, 34 Miss., 485; Wiggins et al. v. McGimpsey, 13 S. & M., 539; Farmers Bank et al. v. Douglass et al., 11 S. & M., 548, 549; Phillips v. Lane, 4 How., 128; Pope v. Lemaster, 5 Littell, 83; McKinsly v. Holliday, 10 Yerger, 477; 5 Cond. S. C. Rep., 383–385; 3 Sugden Vend., 315; Martin v. Nash, 31 Miss., 330; 1 Kent Com., 462; 1 Black. Com., 40; Dwarvis on Stat., 9 Law Lib., 44; 9 Bacon Abr., 283; 2 Kent, 337; Dwarvis on Stat., 64; 7 Johns. R., 497; Bland et ux. v. Muncaster, 24 Miss., 65; Edwards, admr., v. Goulding et al., 38 Miss., 164, 165; Kerr v. Freeman, 33 Miss., 296; Bowman v. Violet, 4 Monroe, 353; 2 Airtles' Dig., p. 139, sec. 24; Lewis' heirs v. Singleton's heirs, 2 Marsh., 26; Clay v. Miller, ib., 461; Longworth v. Wolfington, 6 Ohio R., 10.

Two questions presented by the record, and assignment of errors, remain to be considered. 1st. Was the plaintiff, Chas. E. Learned, barred of his remedy by the statute of limitations? 2d. Was not the finding of the jury on the evidence offered to establish the death of Henry Augustus, erroneous, and was not the death established as a legal presumption arising upon those facts? Under the first of the above propositions the following authorities are referred to: Act of 1844, Hutch. Code, 930; Learned v. Matthews, 40 Miss., 225–227; Bland v. Muncaster, 24 Miss., 62; Robertson v. Haun, Freeman's Ch. R., 265; Tooley v. Kane, S. & M. Ch. R.,cited in Learned v. Matthews, 40 Miss. R.; 1 Sugden on Vend., 66; Story on Cont., 687, sec. 800; Hutch. Code, 667–670–673; Norcum v. Lunn, 33 Miss., 399; 2 Black. Com., 150, 154, 155, 156; Angell on Lim., 384, sec. 2; ib., 390, sec. 8.

As to the presumption of death arising from absence, etc.,
see 2 Starkie Ev., 261 ; 1 Phillipps Ev., 156, and notes to part
first, p. 308, note 300; 1 Greenl. Ev., p. 52–54, sec. 41, notes
4 and 5 ; Rev. Code, art. 252, p. 521 ; Ellis v. Planters Bank,
6 How., 421 ; Regan et al. v. Cargill et al., 24 Miss., 557.

*W. P. Harris,* for the defendant in error.

I propose to notice one point, only, in this case, but I
believe it is the chief point. It is the proposition of the
plaintiff that, in actions of ejectment, the right of the defend-
ant, claiming by deed and in good faith, to the value of his
improvements, depend, altogether upon the option of the
plaintiff to ask for mesne profits. I dissent from this propo-
sition, believing that it was the intention of the legislature
to give to the defendant a substantive right to the value of
his improvements when he is sued in ejectment, and holds
under color of title, in good faith. The language of the Code
is somewhat involved. Code, art 50, p. 389. And it may be
assumed to be substantially a summary of the previous law
on the same subject. Hutch. Code, 856, 857.

If we take the first part of article 20, and the first section
of the act of 1846, Hutch. Code, 826, it would appear that the
claim for the value of improvements, could only be used as
an off-set to a demand for damages or mesne profits. But
taking the whole together, it becomes sufficiently manifest
that the object of the law was first, to give the plaintiff his
land, or the value thereof, at all events ; and second, to
give the defendant the value of his improvements, made in
good faith, at all events.

The first feature of the law to be noticed in support of the
view that the right to the value of the improvements, is a
substantive right, independent of the formal demand by the
plaintiff in the action, for mesne profits is, that the defend-
ant's rights are not measured by the mesne profits or damages.

It is manifest, from this, that the claim for improvements is
not to be compensated merely by the mesne profits, but is
recognized as a claim to be compensated, out of the land
itself.

Again, it is very apparent that it was not the design of the statute to leave the rights or remedies of the defendant to depend on the capricious decision of the plaintiff, so as to enable him, by omitting to claim mesne profits in the principal action, to get possession of the land without paying for improvements. Indeed, where the remedies of the defendant are considered, it is manifest that they have reference to the principal action.

First: Then by giving a right and a remedy beyond the amount of mesne profits, and charging them upon the land.

Second : By so framing the remedy for the enforcement of these rights, as to be applicable only to the pricipal action of ejectment, it becomes manifest that a substantive right is given to the defendant, not dependent on the caprice of the plaintiff ; and that a defendant would, in any action of ejectment, have the right to plead that he had made good and valuable improvements, in good faith.

The plain solution of the whole difficulty is this : The defendant is entitled to insist on having the value of his improvements, but when they are estimated, the value of the rents and profits must also be estimated, and the one set-off against the other, whether the plaintiff has, in form, claimed mesne profits or not. See Bright v. Boyd, 1 Story Rep.

TARBELL, J. :

This is an action of ejectment, commenced in 1858, for the recovery of a parcel of land particularly described in the declaration. No claim is made for mesne profits either in the declaration or proof. The defendant pleaded the general issue, and gave notice therewith of a claim for valuable improvements. The cause was tried at the October term of the circuit court of Copiah county, 1866, resulting in a verdict thus stated in the record : " We, the jury, find for the plaintiff, Rufus F. Learned, an undivided one-third of the land in the declaration mentioned, and assess the value of said undivided one-third, at the sum of thirty-three dollars and thirty-three cents, and find the value of the valuable and

not ornamental improvements made by the defendant on the said land before notice of intention to bring this suit, to be one hundred dollars, and find for the defendant as to Chas. E. Learned." Judgment accordingly, conforming to the provisions of the Code. From this judgment the case is brought to this court upon a bill of exceptions presenting the proceedings and testimony on the trial at the circuit court. Of several questions presented by the assignment of errors, a part only require adjudication.

Upon the trial the defendant offered to prove the value of improvements made by him upon the land sued for prior to notice of the plaintiffs' intention to bring this suit, to which plaintiffs' counsel objected, on the ground that the plaintiffs having made no demand for mesne profits, evidence of the value of the improvements was inadmissible. The court overruled the objection, and allowed the testimony to be given, to which plaintiffs excepted, and assign this action of the circuit court for error. The propriety of this ruling depends upon the construction which may be given to so much of art. 20, p. 398, Rev. Code, as follows, to-wit: " In all cases when the defendant in ejectment would be liable for mesne profits and damages, the plaintiff may declare for and recover the same, in the action of ejectment, or he may have his action for mesne profits after the recovery in ejectment, but it shall be lawful, in all cases, for the defendant to set-off against the demand for mesne profits and damages, or to plead the value of all valuable, and not ornamental improvements made by the defendant on the land before notice of the intention of the plaintiff to bring the action, giving notice, with his plea, of the character of the improvements and the value thereof," etc.

There are, in this provision, two general propositions. The first being, that in all cases in ejectment where the defendant is liable for mesne profits and damages, the plaintiff may claim them in the action of ejectment, or he may have a subsequent action therefor. The second proposition is that it shall be lawful for the defendant to set-off against the

demand for mesne profits and damages, or to plead the value of all valuable and not ornamental improvements, giving notice, with his plea, of the character of his improvements and the value thereof, etc. The minor conditions of these propositions are, that under the first, the plaintiff has, by the plain terms of the law, the absolute and unconditional option of claiming mesne profits, first, in his action of ejectment, or second, by a subsequent action for their recovery. Under the second, the subordinate terms are, first, that the defendant may set-off, etc., which is the right of proving one claim to counter-balance another; second, he may plead, etc., which indicates the form or mode of presenting this subject to the court; and third, he must give notice, with his plea, of the character and value of the improvements, etc. Conceding this option to the plaintiff, can it be defeated by the defendants? Turning again to these provisions, we find the defendant may set-off or plead his improvements against the demand for mesne profits. The plaintiff certainly is not compelled nor compellable to demand mesne profits in his action of ejectment, because the statute says he may elect whether he will make this claim in his action for the possession, or await the recovery therein and bring a subsequent action for mesne profits. Both the terms, set-off and to plead, precede the subject matter which may be set-off or pleaded. If the defendant can defeat the option of the plaintiff, then the latter is denied a right expressly given him, and the statute is inconsistent and contradictory. "The most natural and generous way of construing a statute is to construe one part by another part of the same statute; for this best expresseth the meaning of the makers; and such construction is *ex viceribus actus*." 2 Cranch., 33; ib., 358; 4 Gill. & Johns., 4; 22 Pick., 571; 1 ib., 248.

It is urged by counsel, that the introduction of the words "or to plead," changes the terms of this statute, and enables the defendant to dictate an adjustment of the question of his improvements, on the trial for the right of possession.

We do not think the argument tenable. The terms are substantially that the defendant may " set-off," oa in other words, he may " plead," etc. The words, set-off and plea, are here used synonymously, and they are, in this connection, essentially convertible terms. The right to set-off or plead, must be preceded by the demand upon which the right is dependent. The subject matter of the set-off or plea, is a defense to the demand for mesne profits, and not to the action of ejectment. And this is the theory of the cases. Gr. Ev., sec. 337, and cases.

The same view is indicated in Root v. McFerrin, 37 Miss., 52, wherein the court say: "The statute allows the jury to off-set against any damages assessed by them in favor of the plaintiffs, the value of all valuable, and not ornamental improvements. We think the testimony was competent for the consideration of the jury, as there is proof in the record that plaintiffs claimed damages, and this was proof of the annual value of the land."

It is further urged that this statute is obscure and confused, and an intention of the legislature to extend the right of a defendant beyond the literal import of its words, is contended for. We are unable to agree with counsel. Indeed, we do not well see how language could express terms with greater precision. If the language and conditions of this law are clear, then the intention of the law-makers ought to be positive and beyond doubt, to warrant an interpretation contrary to the accepted, correct, and well known meaning of the words employed in the act.

As to the intention of a legislature, it is difficult of determination. If we question members, no two, probably will give the same response, and thus the result is but conjecture at last. This method, unsatisfactory at best, is impracticable, and we are compelled to resort to other modes of testing the terms of this statute.

Kent says, vol. 1, p. 461, " in the exposition of a statute, the intention of the law-maker, when ascertained, will prevail over the literal sense of the terms; and its reason and

intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion." Accepting the criterion so tersely, and yet so classically expressed, it will be noticed that the basis of the rule stated by this learned author is, when the words of the statute " are not explicit," which we are unable to perceive to be the case with the one under consideration. The " literal sense " of its terms and strict letter of its language, appear to us to lead to a definite and certain conclusion.

" To know what the common law was, before the making of a statute, whereby it may be known whether the statute be introductory of a new law or only affirmatory of the common law, is the very lock and key to set open the windows of a statute." Plow., 365; 2 Inst., 311–318; 3 Rep. 13 Hob., 83–97.

Let us consider the occasion and necessity, the mischief felt, and the remedy in view as a further test of interpretation of the statute under consideration. We do not forget that this is a remedial statute; but we are no less conscious that it is well settled both by precedent and upon principle, that courts are without authority to engraft exceptions, or new and unusual provisions upon a statute.

Tracing the developement of the rights of property, we discover the occasion and necessity of the enactment under consideration, and the remedy in view. Primarily, the occupant of land makes improvements thereon at his peril, and the additions he may create, pass with the freehold; but this rule operating harshly in many instances, relief has been afforded or attempted, in various modes, sometimes by legislation, but most in consonance with reason, in a court of equity. In some of the New England States, enactments called " betterment acts," were attempted in the interest of the early settlers. In other states, laws for a like purpose were created, denominated occupant or claimant acts.

In Virginia, these laws were first aimed at settlers upon United States lands, and applied only to that portion of the state beyond the Alleghany Mountains. The early Kentucky act, declared that the *bona fide* possessor of land should be paid by the successful claimant, for his improvements, and that the claimant must pay them, or elect to relinquish the land to the occupant, on being paid its estimated value in its unimproved state. This law was held by the Supreme Court of the United States, to be unconstitutional, and another later and more unjust was annulled by the Kentucky state courts. In New York, there was a statute relative to lands in what was then called the "Military Tract," similar to the Kentucky act, and liable to the like objections. Of the earlier laws of Massachusetts on this subject, a very able and learned review or criticism, may be found in the American Jurist, vol. 2, No. 4, art. 9, title, "Improvements on Land." "On the statutes of Massachusetts, which give compensation for improvements made on lands by persons holding under defective titles." A. D. 1829. In Maine, it is held that "betternments" are not an interest in land, and pass by parol assignment. In Alabama the claim of defendant for improvements, as we are informed, was at first confined to those deriving title under the United States or Spanish grants. In Tennessee the English rule has been adhered to, both in her statutes and her courts.

Carrying their object of changing the common law to the other extreme, some of these laws became obnoxious to constitutional objections as well as to accepted principles of justice, so that while in some of the states they have been amended and permanently incorporated into their jurisprudence, in others they have become obsolete or materially modified.

Such is an imperfect view of the earlier legislation upon this subject. A more modern exposition, *including* modifications to a recent date, may serve to introduce the code of our own state, upon the incidents to an action of ejectment.

" In some states, the remedy for mesne profits is by an action of trespass, as at common law. In others, the damages for mesne profits are assessed by the jury in the trial of the writ of entry, the real action being thus changed by statute into a mixed action. In several they are assessed, with various restrictions, by the jury, in the trial of the right of possession. In others again, where the value of his lasting improvements is claimed by the defendant, and the value of the land, exclusive of the improvements, is also assessed at the request of the plaintiff, the claim for mesne profits is merged and barred by statute in these proceedings." Story Eq.

In some of the states, the value of the improvements is allowed only by way of set-off to the claim of the plaintiff for mesne profits, as in Iowa. In others, the occupant has a remedy by filing a declaration in a special action on the case, after judgment for possession has been entered against him, in the action of ejectment; in which case the writ of possession is stayed until a trial for the value of the improvements, and the judgment in the latter case constitutes a lien on the land. In other states, upon the trial of the possessory action, the jury, at the request of the respective parties, are required to assess, on the one hand, the increased value of the premises by reason of the improvements made by the occupant, and those under whom he claims; and on the other hand, the value of the land exclusive of those improvements; and the plaintiff is put to his election either to take the land and pay the ascertained value of the improvements, or to abandon the land to the tenant at the price found by the jury; and the payments in either case are made by installments fixed by law, and enforced by issuing or withholding the writ of possession.

In general, the occupancy must have been in good faith and without actual fraud. But in some states the right to remuneration for improvements is given to all occupants who have been in possession, claiming the exclusive title for a certain number of years, as in Massachusetts; while in "other states it is restricted to persons claiming under patents, and

public grants, and by deeds of conveyance; thus intending to exclude all who knowingly enter by wrong, and without color of title. In others, again, the improvements made after notice of the paramount title, are expressly excluded from the consideration of the jury."

In Iowa, improvements are allowed under local regultions somewhat,minute and peculiar, to be set-off against damages, but nothing can. be allowed for them when the plaintifl waives all claim to damages. The civil law has rules peculiarly its own. Though based upon the civil law, the Code Napoleon is so known because of its own distinctive features.

A Spanish law at one period, and exceptional instances in other countries, are reported as allowing improvements under certain circumstances, to claimants, whether *bona fide* or *mala fide.*

In brief, the subject is one which has engaged the earnest attention of law writers, legislators, and courts in all countries, from the earliest times, and yet it is still fruitful of difficulties and contentions. Starting with the simple rule of the savage, of property in possession only, we are enabled to trace the progress and development of title through all its radiations growing out of the necessities and policy of commerce and the advance of civilization, not only in the several states of the union, but in all those nations governed by written laws. In all these centuries of the growth of law and christianity, no question has been more discussed or produced more varied rules than the. claim of the occupant of lands to compensation for improvements.

Kent says of this subject that "there are embarrassments and difficulties in every view of it:" One, at least, of the framers of the Code of 1857 was among the most distinguished jurists of the state, and indeed possessed a reputation not confined to the United States. These codifiers had before them all the text books, all the laws, and all the decisions on this subject, with all the well known difficulties surrounding it. The defendant is not alone the sufferer; the plaintiff also has rights, and may suffer injustice. Even

the improvements of an occupant may be to the true owner only a source of annoyance and regret, if not of actual injury through his personal views of the value of his property and the mode of its management. With this knowledge before the distinguished codifiers of 1857, we cannot presume them to have intended any relief in the article under consideration not clearly expressed therein, or in other words, we presume they have expressed in this statute precisely the relief, and no other, which they intended to extend to the defendant in ejectment.

But it is further urged that, in case the plaintiff in ejectment, after recovery, wherein he declines to demand mesne profits, also refuses his subsequent action therefor, the defendant is without remedy. If the meaning of a statute be doubtful, the consequences are to be considered in the construction; but when the meaning is plain, no consequences are to be regarded in the construction; for this would be assuming a legislative authority. The Queen v. Simpson, 10 Mod., 344. As we have already stated, we presume this statute affords precisely the relief intended, but even if otherwise, it is no more than an instance of omission or inadvertence which often happens, but which the courts have no power to cure. We are not undmindful of consequences, but we must not forget that there are consequences not alone to the parties to this suit.

In Moody v. Harper, 38 Miss., 626, the court say : " We do not deem it necessary to express any opinion upon the point whether, if the previous judgments and decree had not taken place, Moody could have asserted and maintained his claim for improvements and expenditures, upon a bill in equity, filed simply for that purpose."

Without expressing an opinion whether there is any relief for defendants in ejectment, wherein the plaintiff declines to demand damages, and also refuses his subsequent action, we may be allowed to hope that so long as there are courts in Mississippi, there will be no wrongs unredressed.

In regard to this point, Story, in his Eq. Jur., says : " The

proceedings (to adjust mesne profits and improvements) relate to another feature, peculiar in the law of real remedies of some of the United States, but unknown in others, namely : The right of the occupant of land to recover against the true owner, on eviction by him, the value of the lasting improvements, which, in good faith, he has made upon the land. This right, to a certain extent, is a familiar doctrine in courts of equity, and it is freely administered whenever the owner, after recovery of the land, resorts to a bill in equity against the late occupant, for an account of the rents and profits ; but whether those courts would sustain a bill originally brought by the occupant for the value of his improvements, was, until of late, wholly an open question, but is now, in one class of cases, settled in favor of the remedy. At common law, it is well known that no such claim could be maintained ; but the situation of the United States, as a new country, in the course of rapid and even tumultuous occupation, having given rise to great uncertainties in the titles to land, the rule of the common law was found to operate inequitably in very many cases, and sometimes to work gross injustice ; and hence several of the states have been led to provide remedies at law for the protection of honest occupants, and for securing to them the fruits of their labor fairly bestowed in the permanent improvement of the land."

Mr. Justice Story, in Bright v. Boyd, 1 Story R., 478, concludes thus : " I wish, in coming to this conclusion, to be distinctly understood as affirming and maintaining the broad doctrine as a doctrine of equity, that so far as an innocent purchaser for a valuable consideration, without notice of any infirmity in his title, has, by his improvements and meliorations, added to the permanent value of the estate, he is entitled to a full remuneration, and that such increase of value is a lien and charge on the estate, which the absolute owner is bound to discharge before he is to be restored to his original rights in the land. This is the clear result of the Roman law, and it has the most persuasive equity, and I may add, common sense and common justice for its foundation. The bet-

terment acts (as they are commonly called) of the states of Maine and Massachusetts, and of some other states, are founded upon the like equity, and were manifestly intended to support it, even in suits at law for the recovery of the estate." See 2 Story R., 607, 608 ; Swan v. Swan, 8 Price, 518 ; 3 Powell on Mort., 957, note 2, by Coventry. *Vide*, also, 9 Ga. R., 228, and other authorities therein.

We conclude what we have to say on this branch of the case, by quoting an adjudicated rule upon the construction of statutes : "The best rule to arrive at the meaning and intention of the law, is to abide by the words which the law-maker has used." U. S. v. Bright, C. C. Penn. Dis. Act, 1809, Pamph., p. 188. U. S. v. Fisher, 2 Cranch, 386-399.

In our view of this statute, until the plaintiff in eject-ment demands mesne profits and damages in his declaration or proof, the defendant cannot introduce proof of his improve-ments upon the land in controversy. The court, in this case, therefore, erred in admitting the testimony offered by defend-ant, of the value of his improvements.

The second question involved in this statute occurs in its concluding paragraph, to-wit : "But no defendant shall be entitled to such compensation for improvements, unless he shall claim the premises, under some deed or contract of purchase, made or acquired in good faith." It will be observed that the claim must be under some deed, or some contract of purchase, and the claim must be made or acquired in good faith. The problem for determination is, Who are claimants of real estate in good faith, within the legal signification of the term as it is used in this provision of the Code ? Of the practical and legal importance of this question we are well aware.

The facts in this case are briefly these : That the adminis-trator of the estate of the plaintiff's intestate, sold the land in controversy to Thos. H. Wheeler at public sale, but that this sale was never reported to, and never confirmed by the probate court, which an examination of the records would have disclosed. Thos. H. Wheeler never occupied the land,

and conveyed by quit claim deed to Wiley J. Wheeler, who
went into possession and conveyed to Aaron Miller, and he
to defendant. The quit claim deed was not recorded, and
could not be found on search, which omission might also have
been detected by a visit to the record office. George M.
Barnes had a tax title to this land, which he conveyed to
Thos. H. Wheeler—the deed as appears of record being
without date; and this also might have been seen by inspec-
tion of the records. An examination would also have dis-
closed several judgments against the administrator of plain-
tiffs' intestate with sale and conveyance of the real estate of
the intestate to George M. Barnes. One hour at the record
office of Copiah county would have disclosed to defendant,
Corley, the most ample and fatal objections to the title which
he was purchasing. He bought and took possession of the
the land sued for, in 1851, but did not receive title till 1855.
Prior to his purchase, he made no inquiry and no investiga-
tion of title, and now the question comes up, which a few
hours at most, at the proper time, would have obviated, is he
a purchaser in good faith? The primary signification of
" good faith," as defined by Webster, is, " without fraud or
deception." Bouvier says it signifies, " honesty as distin-
guished from *mala fide*, bad faith," while Tomlin says, " That
we say is done *bona fide* which is done really with a *good
faith*, without any fraud or deceit." The term, however, has
sometimes in its legal use, a technical signification which
does not necessarily involve the moral character, beyond that
of diligence in inquiry, where, upon a particular state of
fact, the law pronounces its judgment of good faith, or the
absence of it, wherein the conscience is not affected, though
the line of demarkation .between the technical meaning
referred to, and actual fraud or deceit, is often difficult of pre-
cise determination. This technical definition appears in
Story's Eq. Jur., § 401 : " It has been truly remarked that
there is a material difference between actual notice and the
operation of the registry acts. Actual notice may bind the
conscience of the parties ; the operation of the registry acts

may bind their title, but not their conscience." *Vide*, also, 2 J. Ch. Cas., 190 ; and Dormer v. Fotresque, 3 Atk.

With reference to the subject of " good faith," and to the statutes of the different states of which we have made mention, 2 Kent, p. 405, ed. of 1867, says : " There were, however, peculiar and pressing circumstances which were addressed to the equity of the lawgiver, and led to the passage of those statutes in reference to waste and uncultivated lands in a new country, and where the occupant was not liable to any imputation of negligence or dishonesty. The titles to such lands had, in many cases, become exceedingly obscure, and difficult to be ascertained, by reason of conflicting locations, and a course of fraudulent and desperate speculation; and it is impossible not to perceive and feel the strong equity of those provisions. But in the ordinary state of things, and in a cultivated country, such indulgences are unnecessary and pernicious, and invite to careless intrusions upon the property of others. There are but very few cases in which a person may not, with reasonable diligence and cautious inquiry, discover whether a title be clear or clouded; and *caveat emptor* is a maxim of the common law which is exceedingly conducive to the security of right and title. No man ought to be entitled to these extraordinary benefits of a *bona fide* possession of land, unless he entered and improved in a case which appeared to him, after diligent and faithful inquiry, to be free from suspicion. There is no moral obligation which should compel a man to pay for improvements upon his own land, which he never authorized, and which originated in a tort."

Story's Eq. Jur. §§ 402, 403, makes these very clear distinctions with reference to the English and American doctrine upon the subject under review : " In England, the doctrine seems at length, to be settled, that the mere registration of a conveyance shall not be deemed constructive notice to subsequent purchasers, but that actual notice must be brought home to the party, amounting to fraud. Some learned judges have expressed a doubt whether courts of equity ought not to have said, that

in all cases of a public registry, which is a known depository for conveyances, a subsequent purchaser ought to search or be bound by notice of the registry in the same way as he would be by a decree in equity or by a judgment at law. Other learned judges have intimated a different opinion, assigning as a reason that if the registration of the conveyance should be held constructive notice, it must be notice of all that is contained in the conveyance; and then, subsequent purchasers would be bound to inquire after the contents, the inconveniences of which cannot but be deemed exceedingly great. The question seems first to have arisen in a case of the tacking of mortgages, about the year 1730, and it was then decided, by Lord Chancellor King, that the mere registration of a second mortgage did not prevent a prior mortgagor from tacking a third mortgage, when he had no actual notice of the existence of the second mortgage. This decision has ever since been steadily adhered to, perhaps more from its having become a rule of property than from a sense of its intrinsic propriety.

"In America, however, the doctrine has been differently settled; and it is uniformly held that the registration of a conveyance operates as constructive notice to all subsequent purchasers of any estate, legal or equitable, in the same property. The reasoning upon which this doctrine is founded, is the obvious policy of the registry acts, the duty of the party purchasing under such circumstances to search for prior encumbrances, the means of which search are within his power, and the danger (so forcibly alluded to by Lord Hardwicke), of letting in parol proof of notice, or want of notice of the actual existence of the conveyance. The American doctrine certainly has the advantage of certainty and university of application; and it imposes upon subsequent purchasers a reasonable degree of diligence only in examining their titles to estates."

In England, title deeds pass with the estate. The law supposes the vendor to have these documents in his possession, and these the purchaser must examine at his peril.

Indeed, the purchaser is admonished not to deal with the estate until the "abstract" has been examined with the deeds, and the purchaser will not be bound to complete the purchase until the deeds are produced.   In this country, the record office takes the place of the personal and actual possession of title deeds.

As in the one case, possession of title deeds is actual notice, registry is constructive, held to be equivalent to actual notice, and the purchaser, in the latter, is no less in duty and in law bound to examine title as of record, than in the former, to inspect the abstract and deeds which are in the possession of his vendor, and which he can and must demand for this purpose, to protect his legal rights, or neglect this plain duty at his own risk of the consequences.

The questions of notice, actual and constructive, and of diligence on the part of purchasers of real estate, have been repeatedly adjudicated by our predecessors.   *Vide*, 37 Miss., 51; 32 ib., 129; 41 ib., 384; 40 ib., 518; 31 ib., 330; 24 ib., 227; 30 ib., 59; 34 ib., 485; 38 ib., 164; 41 ib., 267; 13 S. & M., 539; 11 ib., 548; 4 How., 128 ; uniformly holding that the registry of a deed or other paper, authorized and required by law to be recorded, is notice to all subsequent purchasers, and to all the world.

Diligence is enjoined, and *laches* reprehended.   With the depositories of records in every county, there is no excuse for ignorance or neglect.   In Ware v. Houghton, 41 Miss., the court say, "the rule of diligence ought to be more stringent where the means of information are of record in the county * * * and open at all times for examination." The court say in that case, what is equally true in all, that, "the means always existed near at hand, to discover the true state of the title, and a very little diligence, at any moment would have disclosed the defect."   In these Mississippi cases, the long established doctrine is clearly enunciated, that the registry is notice of all papers required by law to be recorded, that a purchaser with notice is not a *bona fide* pur-

chaser, and that this rule is in consonance with reason and justice. *Vide,* also, Story's Eq. Jur.; 3 Kent; 4 Kent.

Two incidental questions arise out of this review. First, as to the requisite diligence and inquiry necessary to constitute a purchaser in good faith, and to entitle him to the legal benefits flowing therefrom. Second, whether clearing land is a proper charge as a valuable improvement to be set-off against the mesne profits.

As to the first, a definite and fixed rule cannot well be established. Each case must stand or fall, to a greater or less extent, upon its own particular facts and circumstances, referring, however, to other portions of this opinion, on this point.

With reference to the second, the objection was not taken on the trial, and we, therefore, express no opinion thereon, but refer to 4 Cow. and authorities cited therein.

As to the quit claim deed:

1. The rule is, that a grantor, without warranty, is considered as intending to grant only what he has. 2 Parsons on Cont., 791.

2d. A grant, release, or bargain and sale, only operate as a conclusion between parties and privies, and do not bind or transfer future or contingent estates, but act only on that estate which the grantor actually had. Jackson v. Hubble, 1 Cowen, 613; Edwards v. Warrick, 5 Denio, 664; Blanchard v. Brooks, 12 Pick., 47; Doane v. Wilcutt, 5 Gray, 328; Ham v. Ham, 14 Me., 351; Kinsman v. Loomis, 12 Ohio, 475; Bell vs. Twilight, 6 Foster, 401.

3d. A quit claim deed implies a doubtful title. 33 Miss., 293.

In our conclusions upon this branch of the case, we find no difficulty in holding that the defendant is not a *bona fide* purchaser of the land in controversy. He neglected to examine the records for the sources of title. The defects which he would have discovered would have admonished him of the necessity of further investigation. Neglecting to resort to the registry he is no less chargeable with knowledge than

from actual notice.   An examination would have exposed the interruption in the chain of title in the absence of any conveyance from Thos. H. to Wiley J. Wheeler, and this would have led him to the still more fatal omissions in the records of the probate court, enabling him to supply the defects, or decline to complete the purchase.   Having taken a defective title, he is held in law to have notice, with or without examination, and is, therefore, not a purchaser in " good faith" within the meaning of the term as used in art. 20, p. 898, Rev. Code.   *Vide*, 3 Atk., 133; 2 ib., 275; 19 Ves., 435 and note; 12 Ves., 129; 3 ib., 478, and note; 2 Gr. Ev.; 4 Cow., 168; 6 Barb., 61; 28 Vt., 181; 1 Story R., 478; 4 Mass., 514; 6 Johns. Ch. R., 166–416; 2 Johns. Ch. R., 603; 2 Johns. R., 543; 20 Wend., 276; Adam on Eject., 391; Dart. on Vendors and P., 402; Williams on Real Prop., 104; 2 Sug. on V., 548, ch. 10; 2 Leading Cases ch. iv, 1, 95.

3. The third and last question we deem it necessary to determine, arises under art. 252, p. 521, Rev. Code, upon the testimony of Mrs. Brown, the mother of plaintiff, to-wit: " That she does not know where Henry Augustus now is, but in the latter part of the year 1856 he sailed from New York, on board the Ind. Embrile bound from New York to Spain. About five days after the ship sailed, there was a violent storm at sea, and neither the ship nor any one on board has ever been heard of since.   The last witness knew or heard of Henry Augustus Learned being alive, was when he embarked on said vessel.   Witness is satisfied he was lost at sea."   Rev. Code, p. 521, art. 252, is as follows:   " Any person who shall remain beyond sea, or absent himself from this state, or conceal himself in this state, for seven years successively, shall be presumed to be dead, in any case wherein his death shall come in question, unless proof be made that he was alive within that time ; but any property or estate recovered in any such case shall be restored to the person evicted or deprived thereof, if in a subsequent action it shall be proved that the person so presumed to be dead, is living."

From 1856, when Henry Augustus was last heard from,

then on board of a vessel on his way to a country beyond seas, to 1866, when the trial took place, was a period of ten years. The question is, was the death of Henry Augustus Learned established as a legal presumption arising upon the testimony? We answer that the testimony of Mrs. Brown being uncontradicted, and no doubt truthful, we are of the opinion, that upon the testimony, the legal presumption was raised, under this statute, of the death of Henry Augustus. So far, therefore, as the verdict was based upon a contrary theory, it was erroneous. Our general conclusions are, that the registry of deeds and other evidences of title to real estate has taken the place of the transfer of title deeds in Great Britain; that the registry of deeds, and other papers authorized and required by law to be recorded, is notice to all the world; that diligence is enjoined; and that purchasers will neglect inquiry and investigation at their peril.

Of course, latent defects, of which there are many, which ordinary prudence will not discover, and the record of papers not authorized and required by law to be recorded, are not embraced in our consideration. Neither do we include titles, encumbrances and claims of an equitable character; but it is manifest that the absence of a deed, or paper from the record required by law to be recorded, may serve no less to warn a prudent man of the necessity of further inquiry than actual notice of a positive defect.

The judgment is reversed and the cause remanded.